**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bathworks Enterprises LLC, | No. CV-25-04437-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| ReBath LLC, | |
| Defendant. | |

Plaintiff Bathworks Enterprises, LLC operates two Florida franchises under agreements with defendant Re-Bath, LLC, a franchisor of residential bathroom remodeling businesses. Bathworks alleges Re-Bath charged unauthorized fees, misused advertising funds, restricted local marketing efforts, and then retaliated against it for challenging that conduct in court. Re-Bath moved to dismiss most of Bathworks's claims. The motion is granted in part and denied in part.

## I.   Background

Defendant Re-Bath is a Delaware company that franchises residential bathroom remodeling businesses. (Doc. 16 at 3–4.) Its principal place of business is in Arizona. (Doc. 16 at 3.) Plaintiff Bathworks Enterprises operates two Re-Bath franchises in Florida. (Doc. 16 at 3.) In April 2022, the parties entered into two separate but identical franchise agreements.[1] (Doc. 16 at 3.) Bathworks now alleges Re-Bath imposed unauthorized technology fees, misused contributions to its Advertising Fund, restricted franchisees' local

---

[1] For simplicity and because the franchise agreements are substantively identical, the court will refer to a singular agreement throughout this order.

marketing efforts, and then retaliated when Bathworks challenged that conduct. (Doc. 16 at 2–3.)

Bathworks alleges Re-Bath had limited contractual authority to charge technology-related fees. Before executing the franchise agreements, Bathworks received Re-Bath's Franchise Disclosure Document ("FDD"). (Doc. 16 at 6.) Bathworks alleges 16 C.F.R. § 436.5 required Re-Bath to disclose in the FDD all fees Bathworks would pay during the contract term. (Doc. 16 at 6.) The FDD identified only one technology-related cost: an ongoing monthly software fee of approximately $300 for a customer relationship management ("CRM") program. (Doc. 16 at 6.) The franchise agreement also addressed technology-related charges by allowing Re-Bath to collect fees or charges relating to the "Computer System[2] . . . for payment to the third party supplier(s) of the Computer System, or components thereof, on a consolidated basis or otherwise." (Docs. 16 at 7; 16-1 at 19.) The franchise agreement allowed Re-Bath to mandate "reasonable" technology-related changes to the Computer System and required software. (Docs. 16 at 7–8; 16-1 at 19.)

In May 2024, Re-Bath announced a new consolidated technology fee, claiming it would provide new software tools and future technology enhancements. (Doc. 16 at 8–9.) Re-Bath initially proposed a $1,500 per-territory fee plus monthly per-user fees. (Doc. 16 at 9.) After franchisee pushback, Re-Bath announced a revised population-based fee structure of $1 per 1,000 people in each franchisee's territory. (Doc. 16 at 9.) On August 5, 2024, Bathworks received its first consolidated technology-fee invoice: $3,021 for July 2024. (Doc. 16 at 9.) Before that, Bathworks's monthly technology fee had been $490. (Doc. 16 at 10.) Because Re-Bath was authorized to automatically withdraw amounts from Bathworks's account, Bathworks alleges it was forced to either allow the withdrawals or turn off automatic payments and risk default. (Doc. 16 at 11.)

---

[2] According to the franchise agreement, the "Computer System" consisted of: back office and point of sale systems, customer relationship management systems, accounting systems, reporting and data exchange systems, data, audio, video, and voice storage, retrieval, and transmission systems; physical, electronic, and other security systems; printers and other peripheral devices; archival back-up systems; e-mail systems; and Internet access mode and speed. (Doc. 16-1 at 48.)

Bathworks alleges the increased fee violated the franchise agreement. (Doc. 16 at 8–9.) The fee was not itemized and Bathworks alleges Re-Bath did not give sufficient notice of the amount owed or the reason for it. (Doc. 16 at 9–10.) According to Bathworks, the fee also did not lead to new technology, enhanced functionality, or improved services. (Doc. 16 at 9.) Instead, many of the tools were allegedly programs inaccessible to franchisees, redundant of programs already used, or otherwise not properly included in the new fee. (Doc. 16 at 10.) Bathworks allegedly later[3] discovered the fee covered Re-Bath's own overhead and labor costs, even though neither the FDD nor the franchise agreement allowed Re-Bath to recover those costs through a technology fee. (Doc. 16 at 11.)

In addition to the technology fee increase, Bathworks challenges the way Re-Bath handled the Advertising Fund. (Doc. 16 at 12.) Under the franchise agreement, franchisees were required to contribute a percentage of gross revenues to the Advertising Fund, which was intended to be used for marketing and brand awareness for the benefit of franchisees. (Doc. 16 at 12.) Bathworks alleges the franchise agreement prohibits Re-Bath from using the Advertising Fund for its ordinary operating expenses. (Doc. 16 at 12.) Re-Bath nevertheless allegedly used Advertising Fund contributions to subsidize overhead and labor expenses unrelated to marketing, technology platforms that benefited only Re-Bath itself, and legal expenses from prior litigation. (Doc. 16 at 12.)

Bathworks also challenges Re-Bath's control over franchisees' local marketing efforts. (Doc. 16 at 12–13.) According to the complaint, Re-Bath pressured franchisees to use Re-Bath-controlled marketing services, made it difficult to work with outside marketing agencies, and limited access to approved marketing materials unless franchisees used its preferred vendors. (Doc. 16 at 12–13.) Those restrictions allegedly prevented franchisees from using their preferred and longstanding local marketing partners, even though the franchise agreement did not authorize Re-Bath to exercise that level of control over local marketing. (Doc. 16 at 13.) The restrictions also allegedly forced franchisees to

---

[3] The complaint states this discovery occurred in November 2024 (Doc. 16 at 11), but Bathworks's response to the motion to dismiss claims that was a scrivener's error and the correct date of the discovery was November 2025 (Doc. 20 at 4).

- 3 -

buy marketing materials at inflated prices and submit marketing invoices through a platform not required by the franchise agreement. (Doc. 16 at 13–15.)

Bathworks filed its original complaint on November 26, 2025. (Doc. 1.) One month later, Re-Bath issued a notice of default identifying four alleged breaches: use of unauthorized marketing vendors, failure to comply with laws and operational standards in connection with a Home Depot project, failure to submit local marketing spend reports through Concur, and unauthorized sales and jobs outside Bathworks's protected territory. (Doc. 16 at 15.) In January 2026, Bathworks disputed the alleged defaults. (Doc. 16 at 15.) On February 5, 2026, Re-Bath issued a Notice of Termination purporting to terminate both franchise agreements. (Doc. 16 at 15.) Bathworks alleges the default and termination were retaliatory and pretextual. (Doc. 16 at 15–16.)

On February 6, 2026, Bathworks filed an amended complaint that asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent concealment, fraudulent misrepresentation, violation of the Arizona Consumer Fraud Act ("ACFA"), specific performance for accounting, and declaratory judgment. (Doc. 16 at 19–27.)[4] Re-Bath moves to dismiss all claims except the wrongful-termination aspects of the breach-of-contract and implied-covenant counts. (Doc. 19 at 1–3.)

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (simplified). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its

---

[4] Bathworks also alleged a Florida Deceptive and Unfair Trade Practices Act claim but has withdrawn that claim. (Doc. 20 at 3 n.1.) Bathworks says it will seek leave to amend to insert a new claim but has not done so as f the date of this order. (Doc. 20 at 3 n.1.)

- 4 -

judicial experience and common sense." *Id*. at 679.

## III. Analysis

Re-Bath moves to dismiss most of Bathworks's claims. It argues the franchise agreement's contractual limitations provision bars nearly all claims, any timely fraud-based theories fail Rule 9(b), the ACFA does not apply to franchises, and the accounting and declaratory-judgment claims are not independent causes of action. (Doc. 19 at 2–3.) Re-Bath does not seek dismissal of the wrongful-termination theories within Bathworks's breach-of-contract and implied-covenant claims. (Docs. 19 at 2; 21 at 2 n.1.) Because Re-Bath does not separately challenge the merits of the breach-of-contract or implied-covenant claims, they are analyzed only for timeliness. The parties' arguments do not map neatly onto the complaint's formal claim labels, so the court addresses the motion by factual theory where necessary rather than proceeding claim-by-claim.

### A. Timeliness

Re-Bath argues that "nearly all" of Bathworks's claims are untimely under the franchise agreement, except those regarding wrongful termination. (Doc. 19 at 7.) A complaint may be dismissed on limitations grounds only when untimeliness is apparent on the face of the complaint. *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006). Under Arizona law, "parties are at liberty to contract and may, indeed, agree to shorten the statute of limitations from that which normally applies to claims." *Zuckerman v. Transamerica Ins. Co.*, 650 P.2d 441, 446 (Ariz. 1982). Section 24.7 of the franchise agreement outlines limitations periods for claims arising out of the contract and the franchise relationship. (Doc. 16-1 at 53.) Under that provision, such claims are barred unless brought before the earliest of three deadlines: the applicable statutory limitations period, "one (1) year after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim," or "two (2) years after the first act or omission giving rise to an alleged claim." (Doc. 16-1 at 53.) Bathworks does not dispute the limitations provision is enforceable. (*See* Doc. 20 at 6.)

### 1. Technology-fee Theories

Many of Bathworks's claims stem from Re-Bath's increased technology fees. The relevant question for assessing the timeliness of any of these claims is when Bathworks discovered, or should have discovered, the facts giving rise to them. Arizona's discovery rule does not require a plaintiff to know every fact supporting its claim before the limitations period begins to run. Instead, the claim accrues when the plaintiff knows, or through reasonable diligence should know, the facts underlying the claim. *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966 (Ariz. 1995). The discovery rule is meant to protect plaintiffs where injuries or acts causing the injury may be difficult to detect; it does not postpone accrual when the injury is open and obvious. *Id.* at 967.

The complaint clearly establishes Bathworks knew or should have known the facts giving rise to its technology-fee theory by August 2024. Re-Bath announced the new consolidated technology-fee structure in May 2024 and justified the fee then by pointing to multiple technology tools it purportedly provided franchisees. (Doc. 16 at 8–9.) On August 5, 2024, Bathworks received a monthly consolidated technology-fee invoice for $3,021, scheduled for automatic withdrawal four days later, representing an increase of more than 500% over the previous fee of $490 per month. (Doc. 16 at 9–10.)

By August 2024, Bathworks had enough information to trigger the one-year limitations period. Bathworks knew the FDD disclosed only a monthly CRM software cost, knew the franchise agreement limited Re-Bath's authority to collect technology-related fees, and knew Re-Bath had suddenly imposed a consolidated technology fee more than six times higher than Bathworks previously paid. (Doc. 16 at 6–10.) Bathworks also knew the fee was not itemized and Re-Bath had not provided the same type of notice it historically gave for vendor-cost increases. (Doc. 16 at 8–10.) Those facts were enough to put Bathworks on notice of a potential wrong and require it to investigate whether the new fee exceeded Re-Bath's authority under the franchise agreement. *See Gust*, 898 P.2d at 966–67.

- 6 -

Bathworks's later discovery of additional facts, such as that the technology fee allegedly included Re-Bath's overhead and labor costs, does not change that conclusion. The technology-fee theory is not limited to the inclusion of overhead and labor. The complaint alleges Re-Bath imposed a new, undisclosed, non-itemized, dramatically-larger technology fee without sufficient notice, without substantiation, and without any corresponding increase in functionality or value. (Doc. 16 at 8–11.) All of these facts were obvious by August 2024, even if additional details were filled in later. Because Bathworks knew enough by August 2024 to identify the alleged wrong and resulting injury, any claim based on the initial imposition of the technology fee accrued then. *Gust*, 898 P.2d at 966.

That conclusion does not bar all aspects of those claims based on the increased technology fee. Under Arizona law, breaches may accrue separately via recurring payments, so a plaintiff may recover for injuries within the limitations period even if earlier ones are time-barred. *See Builders Supply Corp. v. Marshall*, 352 P.2d 982, 986 (Ariz. 1960). Here, Re-Bath continued collecting monthly technology fees through automatic withdrawals that Bathworks says were not contractually authorized. Each allegedly-unauthorized withdrawal may therefore constitute a separate breach rather than a continuing consequence of the first improper invoice.[5] *See id.*; *cf. Ancala Holdings, L.L.C. v. Price*, 220 F. App'x 569, 572 (9th Cir. 2007) (rejecting continuing-breach theory under Arizona law where claim was not based on "recurring payments that have become due"). Bathworks may therefore pursue its technology-fee theory only to the extent it is based on allegedly unauthorized withdrawals occurring within one year before the complaint was filed (*i.e.*, withdrawals on or after November 26, 2024).

---

[5] Re-Bath cites *City of Chandler v. Roosevelt Water Conservation Dist.*, 559 P.3d 184 (Ariz Ct. App. 2024), but the Arizona Supreme Court recently ordered that opinion depublished. *See City of Chandler v. Roosevelt Water Conservation Dist.*, No. CV-24-0267-PR, 2026 WL 1141802, at *1 (Ariz. Apr. 28, 2026). Arizona courts therefore view that case as "neither precedential nor persuasive authority." *Hansen v. Chon-Lopez in & for Cnty. of Pima*, 501 P.3d 762, 772 n.6 (Ariz. Ct. App. 2021). In any event, this case involves recurring withdrawals of money instead of a single repudiation followed by continuing effects.

## 2. Franchise Disclosure Document Theories

Bathworks alleges Re-Bath was required to disclose the consolidated technology fee in the FDD but failed to. (Doc. 16 at 6.) Instead, the FDD identified only one ongoing technology-related charge: a monthly fee of approximately $300 for a CRM system, which Bathworks says was presented as a pass-through payment to the software provider rather than a separate revenue source for Re-Bath. (Doc. 16 at 6.) The FDD also listed several other Computer System programs but stated Re-Bath did not charge franchisees for those programs. (Doc. 16 at 7.) Bathworks believes the failure to disclose all fees supports fraud-based claims. (*See* Docs. 16 at 23–24; 20 at 3, 11–12.) Because FDD-based theories depend on information Re-Bath allegedly failed to disclose before Bathworks signed the franchise agreements, § 24.7(C)'s two-year outside limit applies. That provision bars claims brought more than two years after the "first act or omission giving rise to an alleged claim." (Doc. 16-1 at 53.) Any FDD omission occurred no later than April 11, 2022, when Bathworks signed the franchise agreements. (Doc. 16 at 7.) Bathworks did not file this case until November 2025 and offers no convincing argument for tolling the limitations period. Thus, any claim based on Re-Bath's alleged failure to disclose the consolidated technology fee in the FDD is time-barred.

## 3. Advertising and Marketing Theories

Re-Bath has not shown the Advertising Fund or marketing-restriction theories are time-barred at this stage. Bathworks alleges Re-Bath misused Advertising Fund contributions by diverting them to overhead, technology, and legal expenses unrelated to the fund's marketing purpose. (Doc. 16 at 12.) Bathworks also alleges Re-Bath improperly restricted franchisees' local marketing by limiting their ability to work with outside vendors, inflating prices for marketing materials, and imposing unauthorized reporting requirements. (Doc. 16 at 12–15.) Unlike the technology-fee allegations, however, the face of the complaint does not establish when Bathworks discovered or should have discovered this alleged misconduct. *See Huynh*, 465 F.3d at 997. At least some marketing-related allegations appear tied to reports for May through July 2025, within one year of the

November 2025 complaint. (Doc. 16 at 15.) Because the complaint alone does not establish the Advertising Fund or marketing-restriction theories are untimely, they will not be dismissed on timeliness grounds.

### B.  Fraudulent Misrepresentation and Concealment

Bathworks's remaining fraud theories are narrow. The only potentially timely common-law fraud theories are based on Re-Bath's allegedly unauthorized technology-fee withdrawals within one year before the complaint was filed. Bathworks frames those theories in two ways: fraudulent misrepresentation and fraudulent concealment. (Doc. 16 at 22–24.)

To state a fraud claim, the complaint must allege "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). Under this standard, Bathworks must identify the "who, what, when, where, and how" of the alleged misconduct. *Vess*, 317 F.3d at 1106. The allegations must be specific enough to give the defendant notice of the particular misconduct alleged so the defendant can defend against the charge rather than simply deny wrongdoing. *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir. 1993). In Arizona, a fraudulent-misrepresentation claim requires nine elements: "(1) a representation; (2) its falsity; (3) its materiality;" the speaker's (4) knowledge of its falsity; (5) intent that it be acted upon in the way that would be reasonably expected; the hearer's (6) ignorance of its falsity; (7) reliance on its truth; (8) right to rely on it; and (9) consequent and proximate injury. *Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1033–34 (Ariz. Ct. App. 2010). "'[F]ailure to [plead] any one of [these elements] is fatal to the cause of action.'" *Tavilla v. Cephalon, Inc.*, 870 F. Supp. 2d 759, 774 (D. Ariz. 2012) (citing *Fridenmaker v. Valley Nat'l Bank of Ariz.*, 534 P.2d 1064, 1068 (Ariz. Ct. App. 1975)).

Liability for fraudulent concealment lies against any "party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 34 n.22 (Ariz. 2002), *as corrected* (Apr. 9, 2002).

Active concealment may be actionable even where a party has no independent duty to disclose. *Id.* at 35–36.

Bathworks's fraudulent-misrepresentation allegations do not satisfy Rule 9(b). For reasons already explained, the FDD-based misrepresentation theory is time-barred. What remains post-agreement are claims Re-Bath misrepresented both that the increased technology fees were necessary to recover actual costs, and the nature and purpose of the consolidated technology fee. But the complaint does not identify any timely statement to Bathworks with the specificity Rule 9(b) requires. The concrete statements identified in the complaint occurred during the May and June 2024 rollout of the consolidated technology fee, outside the one-year limitations period. (Doc. 16 at 8–9.) And although the complaint references a January 2025 internal communication from Re-Bath's former CFO, that allegation concerns Re-Bath's internal understanding of its authority to collect technology fees, not any representation made to Bathworks. (Doc. 16 at 8.) Bathworks does not identify a timely affirmative misrepresentation, the speaker, the manner of communication, Bathworks's reliance on that particular statement, or why that particular statement was false when made. *Comerica Bank*, 229 P.3d at 1033–34. Accordingly, the fraudulent-misrepresentation claim is dismissed.

As to fraudulent concealment, Bathworks plausibly pleads a narrow theory with particularity. The complaint identifies Re-Bath as the party that imposed and collected the consolidated technology fee. (Doc. 16 at 8–11.) It identifies the actively-concealed information as the actual basis, calculation, and allocation of that fee—specifically, that the fee allegedly covered Re-Bath's overhead and labor costs rather than technology-related charges authorized by the franchise agreement. (Doc. 16 at 10–11, 22–23.) It explains when the concealment occurred: each time Re-Bath collected the fee without disclosing what Bathworks was actually paying for. (Doc. 16 at 9–11.) It also sets out how the concealment occurred: Re-Bath billed the fee without itemization explaining what Bathworks was paying for, and collected the fee through automatic withdrawals from Bathworks's account. (Doc. 16 at 9–11.) And it identifies why the concealment was

allegedly fraudulent: Re-Bath allegedly knew the intended fee structure was not authorized under Bathworks's version of the franchise agreement but imposed it anyway, while concealing information that would have revealed the fee exceeded Re-Bath's contractual authority. (Doc. 16 at 8.) Taken together, those facts identify the who, what, when, where, and how of the alleged concealment and give Re-Bath notice of the particular theory being asserted. *See Vess*, 317 F.3d at 1106; *Neubronner*, 6 F.3d at 671.

Re-Bath argues the concealment claim should fail because Bathworks does not identify a post-agreement transaction or a duty to disclose. (Doc. 19 at 8–9.) But each timely withdrawal of the technology fee may qualify as a transaction, all of which occurred post-agreement. *See State ex rel. Brnovich v. City of Phx.*, 468 P.3d 1200, 1205 (Ariz. 2020) (explaining "transaction" may mean an "exchange or transfer" of funds, business dealings, or the performance of a contract). And because Bathworks alleges intentional concealment rather than mere nondisclosure, the claim does not fail for lack of an independent duty to disclose. *See Wells Fargo*, 38 P.3d at 34 n.22, 35–36. Accordingly, the fraudulent-concealment claim may proceed to the extent it is based on allegedly unauthorized technology-fee withdrawals on or after November 26, 2024.

## C. Arizona Consumer Fraud Act

The ACFA prohibits "deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." A.R.S. § 44-1522(A); *see Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 826 (D. Ariz. 2016). "Merchandise" includes "objects, wares, goods, commodities, intangibles, real estate or services." A.R.S. § 44-1521(5). Claims under the ACFA are subject to Rule 9(b)'s particularity requirements. *See Gould v. M & I Marshall & Isley Bank*, 860 F. Supp. 2d 985, 988 n.2 (D. Ariz. 2012).

Although the parties debate the issue, the court need not decide whether the ACFA can ever apply to the sale of a franchise. Any ACFA theory based on Re-Bath's FDD

disclosures or the sale of the franchise is untimely under the franchise agreement. The only potentially-timely theory concerns Re-Bath's later technology-fee withdrawals. That theory plausibly falls within the ACFA because Bathworks alleges the recurring fee was tied to software tools and technology platforms Re-Bath provided to franchisees, "services" which undoubtedly qualify as merchandise under the statute. A.R.S. § 44-1521(5). Re-Bath argues the ACFA does not apply because this dispute arises from a franchise relationship (Docs. 19 at 9–11; 21 at 8–10), but does not convincingly explain why a recurring technology fee for software tools and technology platforms cannot qualify as a charge for services. And the alleged deception is pleaded with particularity for the same reason as the fraudulent-concealment theory: Bathworks alleges Re-Bath concealed the basis, calculation, and allocation of the fee through non-itemized invoices and automatic withdrawals while collecting charges Bathworks says were not authorized by the franchise agreement. (Doc. 16 at 8–11.) The ACFA claim therefore may proceed only as to allegedly unauthorized technology-fee withdrawals on or after November 26, 2024.

The advertising and marketing-related ACFA theories do not survive. Bathworks alleges Re-Bath misused Advertising Fund contributions, restricted local marketing vendors, imposed inflated markups on marketing materials, and required franchisees to submit marketing invoices through Concur. (Doc. 16 at 12–15, 24–25.) Those allegations do not plead fraud with the particularity Rule 9(b) requires. Bathworks does not identify a specific deceptive statement or act of concealment tied to those marketing practices, when it occurred, who made it, what Bathworks relied on, or how that conduct caused ACFA damages distinct from the alleged contractual harm. *See Vess*, 317 F.3d at 1106. Thus, the ACFA claim may proceed only as to the timely technology-fee concealment theory.

### D. Demand for Accounting

Bathworks asserts a demand for accounting, arguing the franchise agreement entitles it to a full accounting of Re-Bath's expenditures from the Advertising Fund. (Doc. 16 at 21.) Under Arizona law, actions for accounting are generally reserved for situations involving a fiduciary relationship. *Wright v. Chase Home Fin. LLC*, No. CV-11-0095-

PHX-FJM, 2011 WL 2173906, at *3 (D. Ariz. June 2, 2011) (citing *Mollohan v. Christy*, 294 P.2d 375, 376–77 (Ariz. 1956)). When there is a commercial contract, a fiduciary relationship exists only when one party agrees to serve in a fiduciary capacity. *Urias v. PCS Health Sys., Inc.*, 118 P.3d 29, 35 (Ariz. Ct. App. 2005); *see also Best W. Int'l, Inc. v. AV Inn Assocs. 1, LLC*, No. CV-08-2274-PHX-DGC, 2010 WL 2595274, at *4 (D. Ariz. June 24, 2010), *aff'd*, 464 F. App'x 568 (9th Cir. 2011) (treating franchisor-franchisee relationship as commercial contract that did not impliedly create a fiduciary duty). Here, the franchise agreement explicitly states that Re-Bath assumes no fiduciary obligation in maintaining, directing, or administering the Advertising Fund. (Doc. 16-1 at 29.) Bathworks points to no other allegations showing a fiduciary relationship and does not explain why it could not use ordinary discovery to determine how Re-Bath used Advertising Fund contributions. Accordingly, the "Specific Performance—Demand for Accounting" claim is dismissed.

### E. Declaratory Judgment

Bathworks seeks a declaratory judgment that Re-Bath lacked authority under the franchise agreement to impose the challenged technology fees, use Advertising Fund contributions for non-marketing purposes, and restrict Bathworks's local marketing activities. (Doc. 16 at 26–27.) The Declaratory Judgment Act provides a remedy, not an independent cause of action. *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878–79 (9th Cir. 2022). And even when jurisdiction exists, the court has discretion whether to entertain declaratory relief. *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223 (9th Cir. 1998) (en banc). Here, the requested declaratory relief merely mirrors Bathworks's contract theories, so resolving the breach-of-contract claim will resolve whether Re-Bath's challenged conduct was authorized by the franchise agreement. *See HM Hotel Props. v. Peerless Indem. Ins. Co.*, 874 F. Supp. 2d 850, 855 (D. Ariz. 2012) (dismissing declaratory-relief claim as duplicative of breach-of-contract claim). Accordingly, the standalone declaratory judgment claim is dismissed. However, Bathworks may seek declaratory relief as a remedy if appropriate and tied to a viable underlying claim.

Accordingly,

**IT IS ORDERED** Re-Bath's motion to dismiss (Doc. 19) is **GRANTED IN PART** and **DENIED IN PART** as explained in this order.

**IT IS FURTHER ORDERED as follows**:

The parties are directed to meet, confer, and develop a Rule 26(f) Joint Case Management Report, which must be filed **within 4 weeks of the date of this order**. It is the responsibility of plaintiff(s) to initiate the Rule 26(f) meeting and prepare the Joint Case Management Report. Defendant(s) shall promptly and cooperatively participate in the Rule 26(f) meeting and assist in preparation of the Joint Case Management Report.

The Joint Case Management Report shall contain the following information in separately-numbered paragraphs.

1. The parties who attended the Rule 26(f) meeting and assisted in developing the Joint Case Management Report;

2. A list of all parties in the case, including any parent corporations or entities (for recusal purposes);

3. Any parties that have not been served and an explanation of why they have not been served, and any parties that have been served but have not answered or otherwise appeared;

4. A statement of whether any party expects to add additional parties to the case or otherwise amend pleadings;

5. The names of any parties not subject to the court's personal (or *in rem*) jurisdiction;

6. A description of the basis for the court's subject matter jurisdiction, citing specific jurisdictional statutes. If jurisdiction is based on diversity of citizenship, the report shall include a statement of the citizenship of every party and a description of the amount in dispute. *See* 28 U.S.C. §1332;

7. A short statement of the nature of the case (no more than three pages), including a description of each claim, defense, and affirmative defense;

- 14 -

8.  A listing of contemplated motions and a statement of the issues to be decided by those motions;

9.  Whether the case is suitable for reassignment to a United States Magistrate Judge for all purposes or suitable for referral to a United States Magistrate Judge for a settlement conference;

10. The status of any related cases pending before this or other courts;

11. A discussion of any issues relating to preservation, disclosure, or discovery of electronically stored information ("ESI"), including the parties' preservation of ESI and the form or forms in which it will be produced;

12. A discussion of any issues relating to claims of privilege or work product;

13. A discussion of necessary discovery, which should take into account the December 1, 2015 amendments to Rule 26(b)(1) and should include:

    a.  The extent, nature, and location of discovery anticipated by the parties and why it is proportional to the needs of the case;

    b.  Suggested changes, if any, to the discovery limitations imposed by the Federal Rules of Civil Procedure;

    c.  The number of hours permitted for each deposition. The parties also should consider whether a total number of deposition hours should be set in the case, such as twenty total hours for plaintiffs and twenty total hours for defendants. Such overall time limits have the advantage of providing an incentive for each side to be as efficient as possible in each deposition, while also allowing parties to allocate time among witnesses depending on the importance and complexity of subjects to be covered with the witnesses;

14. Proposed deadlines for each of the following events. In proposing deadlines, the parties should keep in mind the Case Management Order will contain deadlines to govern this case and once the dates have been set the court will vary them only upon a showing of good cause. A request by counsel for

extension of discovery deadlines in any case that has been pending more than two years must be accompanied by a certification stating the client is aware of and approves of the requested extension. The court does not consider settlement talks or the scheduling of mediations to constitute good cause for an extension. The parties must propose the following:

a.    A deadline for the completion of fact discovery, which will also be the deadline for pretrial disclosures pursuant to Rule 26(a)(3). This deadline is the date by which all fact discovery must be *completed*. Discovery requests must be served and depositions noticed sufficiently in advance of this date to ensure reasonable completion by the deadline, including time to resolve discovery disputes. Absent extraordinary circumstances, the court will not entertain discovery disputes after this deadline;

b.    Dates for full and complete expert disclosures and rebuttal expert disclosures, if any;

c.    A deadline for completion of all expert depositions;

d.    A date by which any Rule 35 physical or mental examination will be noticed if such an examination is required by any issues in the case;

e.    A deadline for filing dispositive motions;

f.    Case-specific deadlines and dates, such as the deadline to file a motion for class certification or a date on which the parties are available for a *Markman* (patent claim construction) hearing;

g.    A date by which the parties shall have engaged in face-to-face good faith settlement talks;

h.    Whether a jury trial has been requested and whether the request for a jury trial is contested, setting forth the reasons if the request is contested;

i.    Any other matters that will aid the court and parties in resolving this

case in a just, speedy, and inexpensive manner as required by Federal Rule of Civil Procedure 1;

15.     A statement indicating whether the parties would prefer that the court hold a case management conference before issuing a scheduling order—and, if so, an explanation of why the conference would be helpful.

**IT IS FURTHER ORDERED** the parties shall file a proposed Case Management Order containing all the proposed dates at the same time they file the Rule 26(f) Case Management Report. The proposed Case Management Order must also be emailed in Word format to Lanham_Chambers@azd.uscourts.gov.

Dated this 23rd day of June, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**

- 17 -